# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: LIBERTY REFUND ANTICIPATION LOAN LITIGATION | ) ) ) | MDL No. 2334 |
| This Document Relates to: All Cases | ) ) ) ) ) | Case No. 12 CV 2949<br><br>Judge Joan B. Gottschall |

## MEMORANDUM OPINION & ORDER

This case concerns Liberty Tax Service's practice of offering "refund anticipation loans" to its customers. The plaintiffs allege that Liberty's practice violates various state laws by failing to adequately disclose loan fees, charging unreasonably high interest rates, and deceiving customers about the loans. Liberty moves to compel arbitration and stay further proceedings until arbitration has been completed. For the reasons explained below, the motion is granted in part and denied in part. Specifically, the motion is granted as to the plaintiffs who signed arbitration agreements with Santa Barbara Bank & Trust Company or JTH Financial, LLC, but denied as to the plaintiffs who signed arbitration agreements only with Republic Bank and Trust Company.

### I. BACKGROUND

Refund anticipation loans allow tax filers to receive their refund sooner than if they wait for a mailed check from the IRS. The plaintiffs allege that these loans "include exorbitant finance charges that, when properly calculated in accordance with the Truth in Lending Act ('TILA') and relevant state laws, often exceed 100% APR." (Compl. ¶ 23, ECF No. 18.) They allege that the loans "provide little to no value to consumers at predatory interest rates and fees,

often in conjunction with exorbitant tax preparation fees for straightforward tax filings." (Compl. ¶ 24.)

Each of the fourteen plaintiffs in this case originally sued Liberty in his or her home state. After the Judicial Panel on Multidistrict Litigation consolidated their cases before this court, the plaintiffs filed a thirty-five count consolidated amended complaint. They sue on behalf of themselves, a national class, nine state-specific classes, and a multistate class.

The claims applicable to all of the proposed classes fall into three general categories. First, the plaintiffs bring claims under state statutes requiring tax preparers such as Liberty to disclose information about the fees associated with refund anticipation loans. Second, the plaintiffs allege that Liberty violated state usury laws because the annual percentage rate charged for the loans exceeded the statutory limit. Third, the plaintiffs contend that Liberty violated state consumer-protection laws by (1) violating state statutes concerning refund anticipation loans; (2) violating the Truth in Lending Act, 15 U.S.C. §§ 1601-1667f and (3) deceiving customers about the nature of the loans.

Although the complaint alleges that Liberty "facilitated" the transaction between the customer and the bank issuing the loan, Liberty itself did not issue any loans. The loans were issued by JTH Financial, LLC; Santa Barbara Bank & Trust (SBBT); and Republic Bank and Trust. When customers applied for a loan at one of these banks, they were required to sign a loan agreement. Each bank had its own loan agreement, and each bank's agreement contained a different arbitration clause. Liberty moves to compel arbitration pursuant to these arbitration clauses.

## II. LEGAL STANDARD

The Supreme Court has stated that the "principal purpose" of the Federal Arbitration Act (FAA) is "to ensur[e] that private arbitration agreements are enforced according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. __, 131 S. Ct. 1740, 1748 (2011). As the Court explained in *Concepcion*:

> This purpose is readily apparent from the FAA's text. Section 2 makes arbitration agreements "valid, irrevocable, and enforceable" as written . . . ; § 3 requires courts to stay litigation of arbitral claims pending arbitration of those claims "in accordance with the terms of the agreement"; and § 4 requires courts to compel arbitration "in accordance with the terms of the agreement" upon the motion of either party to the agreement . . . .

*Id.* at 1748. In light of these provisions, the Court has held that "parties may agree to limit the issues subject to arbitration, to arbitrate according to specific rules, and to limit with whom a party will arbitrate its disputes . . . ." *Id.* at 1748-49 (internal citations omitted).

The Court has stated that § 2 of the FAA reflects a "liberal federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Thus, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitrations." *Id.* "Notwithstanding this strong federal policy, however, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009). "As a general rule, therefore, 'the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.'" *MS Dealer*, 177 F.3d at 947 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

In certain circumstances, a nonparty to an arbitration agreement may seek to enforce the agreement against a party. *See Arthur Andersen*, 556 U.S. at 631. As the Court recognized in *Arthur Andersen*, "'traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel . . . .'" *Id.* (quoting 21 WILLISTON ON CONTRACTS § 57.19 (4th ed. 2001)). State law governs the question of whether a nonparty may enforce an arbitration agreement against a party. *See id.* at 630-31 ("[S]tate law . . . is applicable to determine which contracts are binding under § 2 and enforceable under § 3 if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." (alteration in original) (internal quotation marks omitted)).

## III. ANALYSIS

### A. The JTH Financial Arbitration Clause

The plaintiffs who applied for refund anticipation loans through JTH Financial signed an arbitration agreement that states:

> IF YOU OR WE ELECT TO ARBITRATE A CLAIM, YOU WILL NOT HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM.

(Piper Decl. Ex. A (JTH Financial Agreement) § 6, ECF No. 28-1.) The agreement defines "claim" as "any claim, dispute or controversy between you and us that in any way arises from or relates to this Application/Agreement or any you request, including disputes arising from actions or omissions on or prior to the date of this Application/Agreement." (*Id.*) It defines "we" and "us" to mean "not just JTH Financial but also Transmitter and Bank; their parent companies, wholly or majorly-owned subsidiaries, affiliates, commonly-owned companies, successors and assigns; and any of their employees, officers, directors and agents." (*Id.*) It defines "Transmitter" as "JTH Tax, Inc., d/b/a Liberty Tax Service." (*Id.* § 4(c).)

4

The plaintiffs raise no argument against enforcing the JTH Financial agreements. The plaintiffs who signed those agreements agreed that they would arbitrate any claim between them and Liberty. Accordingly, Liberty's motion to compel arbitration is granted insofar as it seeks to enforce these agreements.

## B. The SBBT Arbitration Clause

The plaintiffs who applied for refund anticipation loans through SBBT signed an arbitration agreement that states:

> You agree that any and all disputes among your Tax Preparer, transmitter, SBBT, other RAL lenders and yourself which in any way arise out of or relate to this agreement or any of the dealings between or among any of these parties, shall be resolved solely by binding arbitration before the National Arbitration Forum ("NAF") before a single arbitrator in an arbitration commenced as close as possible to where you reside.

(Piper Decl. Ex. B (SBBT Agreement) § 8, ECF No. 28-2.) Liberty submits that it was a "transmitter" as that term is used in the arbitration clause, and the plaintiffs do not contest this point. Rather, they argue that the arbitration clause is unenforceable because the designated arbitrator (NAF) is unavailable, as that organization stopped accepting consumer arbitrations in 2009.

*Green v. U.S. Cash Advance Illinois, LLC*, 724 F.3d 787 (7th Cir. 2013), forecloses the plaintiffs' argument. In *Green*, the plaintiffs argued that the arbitration clause was unenforceable because NAF was unavailable and because the selection of NAF was "an integral part of the agreement." *Id.* at 789. The Seventh Circuit rejected the plaintiffs' argument, holding that where it is clear from the parties' agreement that the parties selected private dispute resolution, courts should not "use uncertainty in just how that would be accomplished to defeat the evident choice." *Id.* at 793. The court reasoned that because the parties chose arbitration, it was implausible that they would rather litigate than arbitrate in a forum other than NAF. *Id.* at 790.

5

The plaintiffs note that the arbitration clause in *Green* required arbitration under the *procedural rules* of NAF, whereas the arbitration clause here specifically requires arbitration "before" NAF. They argue that "the holding of *Green* is a narrow one: where an arbitration provision only references the procedural rules of the NAF, but does not explicitly state that the dispute must be resolved by the NAF, the FAA authorizes the court to name an alternate arbitrator." (Pls.' Resp. to Defs.' Notice of Supplemental Authority, ECF No. 92-1.)

The court does not find this to be a fair reading of *Green*. While it is true that the court in *Green* held that the arbitration clause "call[ed] for use of the Forum's Code of Procedure, not for the Forum itself to conduct the proceedings," the court went on to analyze the issue as if the arbitration clause specified NAF as the forum, reasoning:

> If . . . the designation of the Forum (or at least of its Code) is "integral" to the agreement, this implies a belief that the customer, the lender, or both would rather litigate than arbitrate under any other rules or in any other forum. Does that belief have any support? When the Forum stopped accepting arbitrations, did *any* merchant revise its contracts to eliminate the arbitration clause? Has any customer insisted on the Forum as a condition of agreeing to arbitration?

*Id.* at 790. The court concluded that it was implausible that the parties would agree to "the National Arbitration Forum or no arbitration at all." *Id.*

Thus, under *Green*, the court must enforce the SBBT arbitration agreement insofar as it calls for private dispute resolution before an arbitrator. Although the parties' chosen arbitrator is unavailable, the court must "supply details in order to make arbitration work." *Id.* at 793. Here, that means appointing a substitute arbitrator. To that end, if the plaintiffs who signed agreements with SBBT still wish to pursue their claims in arbitration, they must submit a proposed list of three arbitrators to this court within thirty days of the entry of this opinion. Liberty will then have fourteen days to respond to the plaintiffs' list and to propose three arbitrators of its own.

The plaintiffs may reply to Liberty's list within seven days. The court will then review the parties' submissions and select an arbitrator.

**C. The Republic Bank Arbitration Clause**

Unlike the plaintiffs who signed arbitration agreements with JTH Financial and SBBT, the plaintiffs who signed arbitration agreements with Republic Bank did not agree to arbitrate their claims against Liberty. Section 10 of the Republic Bank loan agreement requires arbitration of all disputes "against *the Bank and/or related third parties*." (Piper Decl. Ex. E (Republic Bank Agreement) § 10(D) (emphasis added), ECF No. 28-5.) It defines "related third parties" as "the Bank's employees, agents, officers, directors, managers, shareholders or affiliated entities." (*Id.* § 10(B).) Section 9(E) of the agreement states, "[T]he Bank is not affiliated with and does not warrant the performance of the ERO, Transmitter [defined as the 'tax software company'] or the accuracy of the tax return."

Liberty concedes that it has no express right under the Republic Bank agreement to compel arbitration of the plaintiffs' claims. Nevertheless, it argues that it may compel arbitration under "traditional principles of state law." *Arthur Andersen*, 556 U.S. at 631 (internal quotation marks omitted). Liberty contends that Kentucky law governs the agreement and that, under Kentucky law, a nonparty may enforce an arbitration agreement against a party under principles of equitable estoppel, agency, and third-party beneficiary. *See Olshan Found. Repair & Waterproofing v. Otto*, 276 S.W.3d 827, 831 (Ky. Ct. App. 2009).

As an initial matter, the plaintiffs dispute that Kentucky law governs the agreement. They point to Section 10(H) of the agreement, titled "Governing law," which provides that the agreement to arbitrate "is made pursuant to the FAA" and that "[i]f a final non-appealable judgment of a court having jurisdiction over this transaction finds, for any reason, that the FAA

7

does not apply to this transaction, then this agreement to arbitrate shall be governed by the arbitration of the law of the Commonwealth of Kentucky." They argue that because there has been no final non-appealable judgment finding that "the FAA does not apply to this transaction," the court should not apply Kentucky law but rather the law of the state in which each plaintiff entered into the agreement.

A different section of the agreement, titled "Authorization and Additional Terms," states "This Application/Agreement . . . shall be governed by applicable federal laws and the laws of the Commonwealth of Kentucky." (Republic Bank Agreement § 9(E).) In light of this provision, the court is inclined to agree with Liberty that Kentucky law governs the question of whether it may compel arbitration against the plaintiffs. But the court need not dwell on the choice-of-law issue, as the parties agree that there is no significant difference among the nine relevant jurisdictions regarding the law of estoppel, agency, and third-party beneficiary. *See Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994) ("This court has held that before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." (internal quotation marks omitted)). The court will thus proceed as the parties have, drawing from cases across the country that have addressed these issues in similar contexts.

1. **Equitable Estoppel**

The doctrine of equitable estoppel is to be applied "flexibly by a federal court to achieve fairness and avoid injustice." *Jennings Water, Inc. v. North Vernon*, 895 F.2d 311, 316 (7th Cir. 1989). The doctrine rests on the principle that "it is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Am. Bankers Ins.*

*Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006). Courts have recognized that the doctrine of equitable estoppel allows a nonsignatory to compel arbitration in two circumstances:

> First, equitable estoppel applies when the signatory "must rely on the terms of the written agreement in asserting its claim" against a non-signatory. Thus, "[w]hen each of a signatory's claim[s] against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims arise out of and relate directly to the written agreement and arbitration is appropraite." Second, equitable estoppel also applies "when the signatory raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."

*Hoffman v. Deloitte & Touche LLP*, 143 F. Supp. 2d 995, 1004-05 (N.D. Ill. 2001) (alteration in original) (citations omitted) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999), *abrogated on other grounds by Arthur Andersen*, 556 U.S. 624 (2009)); *see also Household Fin. Corp. II v. King*, No. 2009-CA-001472-MR, 2010 WL 3928070, at *4 (Ky. Ct. App. Oct. 8, 2010). Liberty argues that both circumstances exist here.

First, Liberty argues that the plaintiffs' claims "refer to, presume the existence of, and must rely on" the loan agreement. It is true that the complaint "refers to" the loan agreement. (*See, e.g.*, Compl. ¶ 54 (alleging that the loan agreement allocates a portion of the loan fee to Liberty).) It is also true that the plaintiffs' claims "presume the existence of" and "rely on" the loan agreement in the sense that the plaintiffs would not have any claims to assert had they never entered into the loan agreement.

But courts have held that "[f]or a plaintiff's claims to rely on the contract containing the arbitration provision, the contract must form the legal basis of those claims; it is not enough that the contract is factually significant to the plaintiff's claims or has a 'but-for' relationship with them." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 709 (10th Cir. 2011); *see also Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1173 (11th Cir. 2011). Here, the plaintiffs do not seek to enforce the agreement against Liberty, and the agreement does not form

9

the legal basis of the plaintiffs' claims.  Rather, the plaintiffs seek to recover under rights guaranteed to them by state statutes that are separate from the agreement.

Moreover, the fact that the arbitration clause expressly limits its scope to disputes against the bank and certain specified third parties suggests that the clause was not intended to cover disputes against other third parties such as Liberty.  This fact distinguishes this case from many of those relied on by Liberty.  *See, e.g.*, *Amisil Holdings Ltd. v. Clarium Capital Mgmt.*, 622 F. Supp. 2d 825, 829 (N.D. Cal. 2007) (holding that nonsignatories could enforce arbitration clause where plaintiffs agreed to "make a reasonable attempt to resolve *any* controversy or claim arising out of or relating to this Agreement through non-binding mediation" (emphasis added)); *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 526 (5th Cir. 2000) (holding the same where plaintiffs agreed that "*any* dispute or controversy relating to any of the matters referred to in clauses (d)(i), (ii), or (iii), above, shall be decided by a Rent-A-Judge" (emphasis added)).

Liberty counters that fairness dictates compelling arbitration because the plaintiffs' "real" dispute is with the banks, with whom they agreed to arbitrate.  The fact that the plaintiffs have chosen not to sue the banks for strategic reasons, Liberty contends, should not allow them to avoid their agreement to arbitrate.

The court disagrees that the plaintiffs' "real" dispute is with the banks.  The laws on which the plaintiffs rely specifically target tax preparers like Liberty.  *See, e.g.*, Cal. Bus. & Prof. Code § 22251.1 ("It is the intent of this chapter to enable consumers to easily identify credible tax preparers . . . , to ensure tax preparers receive adequate education and treat confidential information appropriately, to prohibit tax preparers from making fraudulent, untrue, or misleading representations, and to provide for a self-funded nonprofit oversight body to register

tax preparers . . . ."). The plaintiffs' claims against Liberty under these laws are independent of any claims they may have against the banks.

Having found that the plaintiffs' claims do not "rely on" the loan agreement in the relevant sense, the court turns to the second circumstance in which equitable estoppel may apply—where "the signatory raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Hoffman*, 143 F. Supp. 2d at 1005 (quoting *MS Dealer*, 277 F.3d at 947). The complaint alleges that Liberty "marketed, arranged, facilitated and made" refund anticipation loans "in coordination with" banking entities (Compl. ¶ 18) and that Liberty "receive[d] a portion of the loan fees/finance charge" (Compl. ¶ 35). Liberty argues that these allegations rise to the level of "substantially interdependent and concerted misconduct."

Liberty argues that "[c]ourts have repeatedly permitted nonsignatories, like Liberty, to compel arbitration against signatories, like the Republic Bank Plaintiffs, based on similar allegations of interdependent and concerted misconduct." (Defs.' Reply Br. 11, ECF No. 75.) To support this proposition, Liberty primarily relies on *Stewart v. Legal Helpers Debt Resolution, LLC*, No. 2:11CV26, 2012 WL 1969624 (W.D.N.C. June 1, 2012).

*Stewart* involved a claim of malpractice against a law firm. *Id.* at *1. The plaintiff had signed an "attorney retainer agreement" with the firm and agreed to arbitrate any claim "related to the agreement." *Id.* at *2. When he discovered that the attorney working on his case was not licensed to practice law, he sued the firm and two of its lawyers. *Id.* at *1. The court held that because the plaintiff "alleged that [the] attorneys . . . were acting in their capacities as members of LHDR[,] . . . their status as agents of [the law firm] enable[s] them to rely on the [retainer agreement] to compel the Plaintiff to arbitration." *Id.* at *3.

11

Here, by contrast, there are no allegations that Liberty was acting as an agent of Republic Bank. The plaintiffs' allegations of interdependence are far weaker than those in *Stewart* and are more akin to allegations in cases where courts have held the doctrine of equitable estoppel inapplicable.

For example, in *Lawson*, the plaintiffs signed a loan agreement when they purchased a car from a dealership. 648 F.3d at 1168. The loan agreement contained an arbitration clause. *Id.* The agreement also gave the plaintiffs an option to purchase life insurance from a separate life-insurance company by checking a box on the agreement. *Id.* When the insurance company refused to pay the plaintiffs a refund to which they felt they were entitled, the plaintiffs sued the company. *Id.* at 1169. The company sought to enforce the arbitration clause in the loan agreement against the plaintiffs under a theory of equitable estoppel, but the Eleventh Circuit held that it was "not the situation" that plaintiffs alleged "substantially interdependent and concerted misconduct." *Id.* at 1172 n.4 (internal quotation marks omitted). Although it was true in *Lawson* that the dealership "facilitated" the transaction "in coordination" with the insurance company, the court held that these allegations did not reach the level of interdependence necessary for equitable estoppel to apply. *See id.* The court finds the same to be true here.

Because this case does not present either of the two circumstances in which equitable estoppel applies, the court declines to compel arbitration under that theory.

### 2. **Agency**

A nonsignatory may compel arbitration under agency principles if "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." *MS Dealer*, 177 F.3d at 947. There are two reasons for this

rule: (1) because an entity "can only act through its employees, and an arbitration agreement would be of little value if it did not extend to them," and (2) because, if a party could "avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as defendants in his complaint, . . . the effect of the rule requiring arbitration would, in effect, be nullified." *Amisil*, 622 F. Supp. 2d at 833 (internal quotation marks omitted). "Under basic agency principles," an entity is an agent of a principal if it "acts on the principal's behalf and is subject to the principal's control." *Ernst & Young, LLP v. Clark*, 323 S.W.3d 682, 694 (Ky. 2010) (citing RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006).)

Liberty argues that it was a limited agent of Republic Bank for the purpose of the refund anticipation loan program. The terms of the arrangement between Liberty and Republic Bank are set out in a "marketing and servicing agreement" between the two companies. Under that agreement, Liberty agreed to:

- "promote and market" Republic Bank's loans "in promotional materials provided to [c]ustomers by Liberty and on Liberty's website" and to submit such materials "to Republic for prior written approval" (Piper Decl. Ex. H (Marketing and Servicing Agreement) § 3(a), ECF No. 28-8);
- "incorporate the Financial Product Program into Liberty's tax preparation software in accordance with Republic's Record Layouts and Processing Specifications" (*id.* § 3(b)); and
- "offer to [its franchisees] training regarding [Republic Bank's] Financial Products" and to "submit the training to Republic for prior review and approval" (*id.* § 3(f)).

For its part, Republic Bank agreed to "develop reasonable program guidelines for the offering, marketing, receipt and processing of [refund anticipation loan] [a]pplications" and to "provide such assistance as Liberty reasonably may request in connection with the preparation and dissemination to customers of State Disclosure Documents." (*Id.* §4(a).) Liberty argues that these facts demonstrate that Liberty was a limited agent of Republic Bank for the purpose of the refund-anticipation loan program.

The plaintiffs argue that there was no such agency relationship. They direct the court to § 17 of the marketing and servicing agreement, titled "Relationship of the Parties," which states, "This Agreement is not intended to create, and shall not create a partnership relationship or joint venture between Republic and Liberty, each party being an independent contractor." They also rely on the language of the loan agreement itself, which states that "the Bank is not affiliated with and does not warrant the performance of the ERO, Transmitter [defined as the "tax software company"] or the accuracy of the tax return." (Republic Bank Agreement § 9(E).)

Here, the court finds that the relationship between Liberty and Republic Bank is not so close that "only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." *MS Dealer*, 177 F.3d at 947. To be sure, Liberty owed certain duties to Republic Bank under the marketing and servicing agreement, but Republic Bank owed duties to Liberty as well. The agreement does not demonstrate that Republic Bank "controlled" Liberty any more than one party would control another in a typical business transaction.

Moreover, the complaint's allegations suggest that Liberty played as large of a role as the banks did in devising the refund-anticipation-loan program. The complaint alleges that refund anticipation loans are "a significant profit source to [Liberty] and other for-profit tax preparers, and a fundamental part of their business models." (Compl. ¶ 19.) When SBBT was prohibited from issuing refund anticipation loans, the complaint alleges that Liberty simply switched to Republic Bank. (Compl. ¶ 25.) The complaint alleges that the relationship between Liberty and the banks was "merely a scheme, device, and contrivance created by [Liberty] in an attempt to circumvent applicable usury laws." (Compl. ¶ 26.) These allegations are inconsistent with the notion that Liberty was doing nothing more than acting on Republic Bank's behalf.

14

Because the court finds that Liberty was not acting as an agent of Republic Bank, it cannot compel arbitration under a theory of agency.

### 3. **Third-Party Beneficiary**

Finally, Liberty argues that it may compel arbitration because it is a third-party beneficiary of the loan agreement. A nonsignatory may compel arbitration where "the parties to a contract together agree, upon formation of their agreement, to confer certain benefits thereunder upon a third party, affording that third party rights of action against them under the contract." *MS Dealer*, 177 F.3d at 947. A non-signatory is a third-party beneficiary if "the parties to the contract intended by their agreement to benefit the third parties directly." *Olshan*, 276 S.W.3d at 831.

The reasons Liberty offers for why it was a third-party beneficiary of the Republic Bank agreement are similar to those it offers for why it was an agent of Republic Bank. Liberty notes that the agreement's arbitration clause extends to the bank's "agents" and "related third parties" and argues that the parties intended those terms to cover Liberty. It concludes that the "explicit language of the arbitration clause . . . demonstrate[s] the intent to benefit Liberty." (Defs.' Br. 25.) Additionally, Liberty argues that the "circumstances surrounding the agreement" demonstrate an intent to benefit Liberty, as the agreement authorizes the bank to deduct "any or all authorized fees due the tax software company." (Republic Bank Agreement § 9(A)(iii).)

For reasons similar to those discussed in the previous two sections, the court concludes that Liberty is not entitled to compel arbitration under a third-party beneficiary theory. Liberty is not an "agent" or "related third party" under the agreement, so the terms of the agreement do not demonstrate the parties' intent to benefit Liberty directly. Although a third-party beneficiary "need not be named or identified individually," *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp.

15

2d 1092, 1117 (C.D. Cal. 2009), there still must be "substantial evidence of a clear intention to benefit that third party," as "[t]he presumption is that parties contract only for themselves and a contract will not be construed as having been made for the benefit of a third party unless it clearly appears that such was the intention of the parties." *Simmons Foods, Inc. v. H. Mahmood J. Al-Bunnia & Sons Co.*, 634 F.3d 466, 470 (8th Cir. 2011) (citations omitted) (internal quotation marks omitted).

Here, the agreement refers to Liberty only indirectly, as the "transmitter" or "tax software company." It provides that the bank "is not affiliated with . . . [the] transmitter." (Republic Bank Agreement § 9(E).) The portion of the agreement that arguably benefits Liberty only "authorize[s] the Bank to deduct and pay . . . any or all authorized fees due the tax software company (Transmitter)." (*Id.* § 9(A)(iii).) While the agreement set in motion a process whereby Liberty eventually received a portion of the loan fee, that alone is insufficient to establish that Liberty is a third-party beneficiary.

Accordingly, Liberty may not compel arbitration under a third-party-beneficiary theory.

### 4. Section 10(J) of the Loan Agreement

Because the plaintiffs who signed arbitration agreements with Republic Bank did not agree to arbitrate their claims against Liberty, and because Liberty may not compel arbitration of those claims under theories of equitable estoppel, agency, or third-party beneficiary, Liberty's motion to compel arbitration is denied as to the plaintiffs who signed agreements only with Republic Bank.

The Republic Bank plaintiffs offer an additional reason why they believe the arbitration clause is inapplicable to their claims. Section 10(J) of the loan agreement states, "This Section 9 [sic] (Waiver of Jury Trial and Arbitration) does not apply in Maine, New York, or any other

state where prohibited." Because the arbitration clause contains a class-action waiver, the plaintiffs argue that the arbitration clause does not apply in states that prohibit such waivers.

In *Concepcion*, the Supreme Court held that the FAA prohibits states from conditioning the enforceability of arbitration agreements on the availability of classwide procedures. 131 S. Ct. at 1746. The plaintiffs argue that because *Concepcion* was decided after each of the plaintiffs signed the loan agreements, the arbitration clause was still "prohibited" by states when the plaintiffs signed the agreements, and thus the arbitration clause is unenforceable under § 10(J).

In a separate opinion issued today in a related case, the court explains why it finds this argument to be unavailing. *See* Memorandum Opinion & Order, *H&R Block Refund Anticipation Loan Litig.*, No. 12 C 2973 (N.D. Ill. July 23, 2014), ECF No. 91; *see also Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013).

## IV. CONCLUSION

For the foregoing reasons, Liberty's motion to compel arbitration and stay proceedings is granted as to the plaintiffs who signed loan agreements with JTH Financial and SBBT, but denied as to the plaintiffs who signed loan agreements only with Republic Bank. If the plaintiffs who signed agreements with SBBT still wish to pursue their claims in arbitration, they must submit a proposed list of three arbitrators to this court within thirty days of the entry of this opinion. Liberty will then have fourteen days to respond to the plaintiffs' list and to propose three arbitrators of their own. The plaintiffs may reply to Liberty's list within seven days. The court will then review the parties' submissions and select an arbitrator.

Liberty's motion to strike the declarations of Erich B. Neumann, Jeffrey M. Ostrow, and Martin E. Wolf is denied as moot; it was unnecessary to consider those declarations in light of the court's holding that Liberty cannot move to compel arbitration under the Republic Bank

agreements. Liberty's motion for leave to file supplemental authority, dated June 30, 2014, is granted.

A status hearing is set for August 13, 2014, at 9:30 a.m.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: July 23, 2014